**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
MIDLAND/ODESSA DIVISION**

| | | |
|---|---|---|
| **TIMOTHY W. REPASS and WILLIAM** | § | |
| **SCOTT McCANDLESS, Individually** | § | |
| **and On Behalf of All Others Similarly** | § | |
| **Situated,** | § | **Civil Action No.** |
| | § | |
| **Plaintiffs,** | § | **7:18-CV-107-DC-RCG** |
| | § | |
| **v.** | § | |
| | § | |
| **TNT CRANE AND RIGGING, INC.** | § | |
| | § | |
| **Defendant.** | § | |

## PLAINTIFFS' MOTION FOR PARTIAL SUMMARY JUDGMENT

### I.     INTRODUCTION

Named and Opt-In Plaintiffs (collectively "Plaintiffs") now move for partial summary judgment against Defendant TNT Crane and Rigging, Inc. ("TNT") in this Fair Labor Standards Act and New Mexico Minimum Wage Act off-the-clock case on the following issues:

1. TNT's liability for unpaid overtime compensation for time Plaintiffs spent performing undisputedly compensable work at the beginning and end of the workday, including undisputedly compensable time traveling to and from jobsites within the continuous workday;

2. Applicability of the *Mt. Clemens Pottery* burden-shifting scheme due to TNT's undisputed failure to record the unpaid time; and

3. TNTs' liability for liquidated damages due to TNT's admitted knowledge that it violated the FLSA.

To clarify the scope of this motion, Plaintiffs do not seek summary judgment on the amount of damages nor on TNT's liability for *every factual basis* constituting an instance of unpaid overtime that they intend to prove at trial.[1] Nor do Plaintiffs contend that *every single Plaintiff* experienced *all of* the

---

[1] For example, Plaintiffs allege that Defendant did not allow them to claim all their actual work time on their time sheets for various other tasks and Defendant sometimes altered their time sheets—often surreptitiously—to reduce the hours Plaintiffs logged. Defendant denies those allegations, so they must be adjudicated at trial.

same set of facts. The extent to which each Plaintiff experienced the facts at issue in this motion and the amount of their damages remain for trial. The procedure for trying the remaining issues is the subject of the parties' respective proposed trial plans to be presented in connection with TNTs' Motion for Decertification. Partial summary judgment is appropriate to establish TNT's liability based on the undisputed facts discussed below constituting the core overtime violations at issue in this action, at least as to some of the Plaintiffs, as well as applicability of *Mt. Clemens Pottery* and liquidated damages.[2]

Plaintiffs were employed by TNT as non-exempt crane operators working out of TNT's Houston, San Antonio, and Midland Yards. (Order Adopting Report and Recommendation on Motion for Conditional Certification, Dkt. 29, *2).[3] TNT admits that, as a matter of policy, depending on the arrangement TNT had with its customer, it routinely refused to pay Plaintiffs for undisputely compensable work that they performed before driving to their jobsites and the time they spent driving to their jobsites after they had performed compensable work. Similarly, TNT admits that it routinely refused to pay Plaintiffs for the time they spent driving back from their jobsites and performing additional compensable work after the drive. These driving times were often significant, including travel to remote oilfield drilling sties in the Permian Basin in Texas and New Mexico and in the Eagle Ford Shale region in Texas, as well as worksites in other regions. For example, drive times from the Midland yard to the Plaintiffs' jobsites were often between one hour and 45 minutes to three hours. (Undisputed Fact 1.)[4]

TNT concedes that it failed to keep records of the unpaid time in question, which undisputedly invokes the burden-shifting rule for proving the amount of damages established by the Supreme Court

---

[2] Consistent with the scope of this motion, Plaintiffs do not attempt to cite all relevant evidence from each of the representative discovery plaintiffs to establish each summary judgment fact, but rather only sufficient representative evidence to establish the violations as to at least some of the Plaintiffs.

[3] Defendant concedes that Plaintiffs are not exempt from the protections of the Fair Labor Standards Act, 29 U.S.C. § 201, *et seq.*, and therefore that they were entitled to be paid at one and one-half times their regular rates of pay for all hours that they worked over forty in a workweek. 29 U.S.C. § 207(a)(1); (**Ex. A**, Defendant's Response to Plaintiff Repass's Interrogatory No. 16.)

[4] Plaintiffs incorporate by reference their attached Appendix of Undisputed Facts citing to the deposition transcripts and evidence in the summary judgment record, which are also attached as exhibits.

in *Anderson v. Mt. Clemens Pottery Company*, 328 U.S. 680 (1946).

Finally, TNT's officers and managers who were responsible for complying with the overtime pay requirements admit that they have known throughout all the relevant years that the unpaid tasks in question were compensable. Therefore, as a matter of law, TNT cannot establish its good faith defense to liquidated damages.

## II.   SUMMARY JUDGMENT STANDARD

Summary judgment is required "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." FED. R. CIV. P. 56; *Canal Ins. Co. v. Flores,* 524 F. Supp.2d 828, 832-34 (W.D. Tex. 2007). A dispute about a material fact is genuine only "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986); *Ellison v. Software Spectrum, Inc.*, 85 F.3d 187, 189 (5th Cir. 1996).

"[The] party seeking summary judgment always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of [the record] which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323-34 (1986); *Wallace v. Texas Tech. Univ.*, 80 F.3d 1042, 1046-1047 (5th Cir. 1996). The non-movant's burden may not be satisfied by "conclusory allegations, unsubstantiated assertions, or only a scintilla of evidence." *Warfield v. Byron*, 436 F.3d 551, 557 (5th Cir. 2006) (quoting *Freeman v. Texas Dep't of Crim. Justice*, 369 F.3d 854, 860 (5th Cir. 2004)). Fact disputes are resolved in favor of the non-movant, "but only when there is an actual controversy, that is, when both parties have submitted evidence of contradictory facts." *Little v. Liquid Air Corp.*, 37 F.3d 1069, 1075 (5th Cir. 1994) (en banc). Thus, the ultimate inquiry is "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Anderson*, 477 U.S. at 251-52.

## III.   ARGUMENT AND AUTHORITIES

**A. There is no genuine issue of material fact on TNT's liability for some of the Plaintiffs' unpaid compensable work time.**

An FLSA plaintiff must prove the following in order to obtain judgment against an employer for unpaid overtime: "(1) that there existed an employer-employee relationship during the unpaid overtime periods claimed; (2) that the employee engaged in activities within the coverage of the FLSA; (3) that the employer violated the FLSA's overtime wage requirements; and (4) the amount of overtime compensation due." *Parrish v. Premier Directional Drilling, L.P.*, 917 F.3d 369, 379 (5th Cir. 2019) (citations omitted); *see also* Fifth Circuit Pattern Jury Instruction 11.24 (not including damages as an element). Courts interpreting the FLSA are instructed to do so broadly in favor of employees. *See, e.g., Allen v. McWane, Inc.*, 593 F.3d 449, 452 (5th Cir. 2010).

Plaintiffs do not seek summary judgment on the amount of their damages. Therefore, only the first three elements are at issue.

### 1.   TNT admits the first and second elements of the prima facie case.

As for the first element, TNT admits that there was an employee-employer relationship under the FLSA. (Dkts. 77 and 79, ¶¶ 9-10). As for the second element, the FLSA requires employers to comply with its overtime and minimum wage provisions if they have (1) employees engaged in commerce or in the production of goods for "commerce" under 29 U.S.C. §203(b) (known as "individual coverage") or (2) employees "employed in an enterprise engaged in commerce or in the production of goods for commerce" under 29 U.S.C. §203(s)(1) (known as "enterprise coverage"). 29 U.S.C. §207(a)(1). "*Either* individual *or* enterprise coverage is enough to invoke FLSA protection." *Martin v. Bedel*l, 955 F.2d 1029, 1032 (5th Cir. 1992) (emphasis in original). Here, TNT admits FLSA coverage. (*Id.*, ¶¶ 11-13, 18; **Ex. A**, No. 20).

2. <u>It is undisputed that TNT violated the FLSA's overtime requirement.</u>

a. *Under the "continuous workday" or "whistle-to-whistle" rule, Plaintiffs are entitled to overtime compensation for their first and last "principal activities" of the workday, as well as travel time that falls between them.*

As for the third element, Plaintiffs worked over forty hours in a workweek without receiving overtime compensation for (1) the work they performed before driving to their jobsites at the beginning of many workdays or after driving back from their jobsites at the end of the day, as well as (2) the time they spent driving to their jobsites after performing compensable work or back from their jobsites before performing additional compensable work.

i. <u>The "Continuous Workday," or "Whistle-to-Whistle," Rule</u>

Under the Portal-to-Portal Act of 1947, which amended the FLSA,[5] all working time, including travel time, is compensable if it occurs after the first, but before the last, performance of the "principal activity or activities" which the employee is hired to perform; but an employee's time is non-compensable if it is spent performing preliminary or postliminary activities that do not constitute "principal activities." *See* 29 U.S.C. § 254(a). The employer bears the burden to prove that the Plaintiffs' work time is non-compensable under the Portal-to-Portal Act. *See Bleichner v. Speis Painting & Decorating, Inc.*, No. 08–cv–057–bbc, 2009 WL 281145, *7 (W.D. Wis., Feb. 3, 2009), (*citing Walling v. General Industries Co.,* 330 U.S. 545, 547–48 (1947)). TNT cannot carry that burden here.

It is well settled under the "continuous workday," or "whistle to whistle" rule, that an employee's

---

[5] The Portal-to-Portal Act, 29 U.S.C. § 254(a), reads as follows:

Except as provided in subsection (b) of this section, no employer shall be subject to any liability or punishment under the Fair Labor Standards Act of 1938, as amended, the Walsh-Healey Act, or the Bacon-Davis Act, on account of the failure of such employer to pay an employee minimum wages, or to pay an employee overtime compensation, for or on account of any of the following activities of such employee engaged in on or after May 14, 1947--

(1) walking, riding, or traveling to and from the actual place of performance of the principal activity or activities which such employee is employed to perform, and

(2) activities which are preliminary to or postliminary to said principal activity or activities,

which occur either prior to the time on any particular workday at which such employee commences, or subsequent to the time on any particular workday at which he ceases, such principal activity or activities.

compensable time begins to run when he performs his first principal activity or activities of the day, and it continues to run through the performance of the day's last principal activity or activities. *IBP, Inc. v. Alvarez*, 546 U.S. 21, 29 (2005) (holding that time spent walking after performing the first principal activities of the day is compensable); 29 C.F.R. §790.6(a) ("Periods of time between the commencement of the employee's first principal activity and the completion of his last principal activity on any workday must be included in the computation of hours worked to the same extent as would be required if the Portal Act had not been enacted.").[6] In short, other than *bona fide* meal breaks under 29 C.F.R. §785.19, an employer must pay its employees for all of the employees' time after they have performed one of their first principal activities of the day until they perform the last principal activity of the day.

Stated another way, all time under the FLSA is compensable when it is "all in a day's work." *See also* 29 C.F.R. §785.38 ("Where an employee is required to report at a meeting place to receive instructions or to perform other work there, or to pick up and to carry tools, the travel from the designated place to the work place is part of the day's work, and must be counted as hours worked regardless of contract, custom, or practice."). Consistent with this notion, as the Fifth Circuit noted in *Vega v. Gasper*:

> Where an employee is required to report at a meeting place to receive instructions or to perform other work there, or to pick up and to carry tools, the travel from the designated place to the workplace is part of the day's work, and must be counted.

*Vega v. Gaspar*, 36 F.3d 417, 424 (5th Cir. 1994) (internal quotations omitted) (*citing and quoting* 29 C.F.R. 785.38).[7] Thus, under the FLSA, all of an employee's time is compensable from the time that he

---

[6] *See also Cantu v. Milberger Landscaping, Inc.*, 12 F. Supp. 3d 918, 921-22 (W.D. Tex. 2014) ("Under this rule, an employee's travel time is not compensable unless it is an indispensable part of performing one's job . . . However, where an employee is required to report at a meeting place to receive instructions or to perform other work there, or to pick up and carry tools, the travel from the designated place to the workplace is part of the day's work, and must be counted." (internal citations and quotations omitted); *Garcia v. Champion Glass, LLC*, Civ. No. SA-12-CA-0703-FB, 2014 WL 12537863, *4 (W.D. Tex. Oct. 23, 2014) (holding that the plaintiffs' evidence that they loaded and unloaded tools and equipment at the defendant's place of business prior to and after their regular work hours was sufficient evidence of principal activities to defeat employer's motion for summary judgment); *Johnson v. RGIS Inventory Specialists*, 554 F. Supp. 2d 693, 703-704 (E.D. Tex. 2007)("[U]nder the continuous workday or whistle to whistle rule, the workday is defined as the period between the commencement and completion on the same workday of an employee's principal activity or activities.").

[7] Notably, although the *Vega* court discusses a "require[ment] to report at a meeting place," (and assuming, *arguendo*, that this phrase refers to the employer "requir[ing]" something of the employee) in *Integrity Staffing Solutions, Inc. v. Busk*, the Supreme Court subsequently and explicitly clarified that the employer need not "require[]," or even benefit from, a principal

performs the first principal activity of the day to the time that he performs the last principal activity of the day.

ii.  "Principal Activities"

"Principal activities," in turn, includes all "activities [that are] an integral and indispensable part of the principal activities for which covered workmen are employed . . ." *IBP, Inc.* 546 U.S. at 29-30 (*citing Steiner v. Mitchell,* 350 U.S. 247, 256 (1956)). "An activity is . . . integral and indispensable to the principal activities that an employee is employed to perform if it is an intrinsic element of those activities and one with which the employee cannot dispense if he is to perform his principal activities." *Busk*, 574 U.S. at 33; *see also* 29 C.F.R. § 790.8 (citing, as an example, the time spent by a chemical plant employee changing clothes would be compensable if he was unable to "perform his principal activities without putting on certain clothes," but would not be compensable if "changing clothes [were] merely a convenience to the employee not directly related to his principal activities." (cited with approval in *Busk*, 574 U.S. at 34)).

"Critically, the integral-and-indispensable inquiry does not turn on whether the employer requires the activity or whether the activity benefits the employer . . . Instead, the question is 'tied to the productive work that the employee is *employed to perform*.' " *Aguilar*, 948 F.3d at 1276-77 and n. 3 (internal footnote and citation omitted; emphasis in *Busk*) (*citing and quoting Busk*, 574 U.S. at 36); *see also, Busk*, 574 U.S. at 36 ("A test that turns on whether the activity is for the benefit of the employer is similarly overbroad."). *See also* 29 C.F.R. § 790.8(a) (explaining that the term "principal activities" was "considered sufficiently broad to embrace within its terms such activities as are indispensable *to the*

_____

activity in order for the employee's work to be compensable. *Aguilar v. Management & Training Corp.*, 948 F.3d 1270, 1276-77 and n. 3 (10th Cir. 2020) (*citing Integrity Staffing Solutions, Inc. v. Busk*, 574 U.S. 27, 36 (2014)). In addition, although "work" is not defined in the FLSA, the Supreme Court has given it a broad reach. "Work" under the FLSA is defined by the Supreme Court as "physical or mental exertion (whether burdensome or not) controlled or required by the employer and pursued necessarily and primarily for the benefit of the employer and his business." *Busk*, 574 U.S. at 31 (*citing and quoting Tennessee Coal, Iron & R.R. v. Muscoda Local No. 123*, 321 U.S. 590, 598 (1944); *see also Jewell Ridge Coal Corp. v. Local No. 6167*, 325 U.S. 161, 164-66 (1945).

*performance of productive work*" (internal quotation marks omitted; emphasis added)); § 790.8(c)
("Among the activities included as an integral part of a principal activity are those closely related
activities which are indispensable *to its performance*." (emphasis added)). The focus of the "principal
activity" inquiry, therefore, is on the employee's work, and not on whether the employer requires or even
directly benefits from it.[8]

      b.   *Obtaining and loading materials necessary for the job and picking up and dropping off coworkers required for the job at the employer's office to transport them to a jobsite are integral and indispensable to the principal activities.*

Plaintiffs here are similar to the plaintiffs in the *Cantu*, *Garcia*, and *Johnson* cases, all cited in
Footnote 6 above. For example, in *Cantu*, the plaintiffs—landscape workers—went to the employer's
yard before their shifts in the morning and loaded lawnmowers, tools, water, ice, and other equipment
before they left the yard for the day's work; and, in the evenings, they would unload refuse, equipment,
other materials, and generally prepare for the next day's work at the end of the day. *Cantu*, 12 F. Supp.
3d at 922-23. Like the Plaintiffs here, the *Cantu* plaintiffs were also not paid for certain of their travel
time that occurred after the first principal activity (loading tools and equipment in the morning), but
before the last principal activity (unloading tools and refuse and preparing for the next day's work), of
the day. *Id.* The *Cantu* court held that the plaintiffs there performed compensable work before and after
their shifts, and granted the plaintiffs' motion for partial summary judgment (and denied the defendant's
motion for summary judgment) on the issue of the compensability of some of their travel and work time.
*Id.*, 922-23, 924.

Similarly, when an employee is required to report to the employer's facilities to pick up and drop
off a coworker and transport them to a jobsite and the coworker is necessary to perform the work, such
time is also compensable work. *See Scalia v. AWP, Inc.*, No. 1:18-CV-1183, 2020 WL 7639980, at *11

---

[8] Similarly, the Fifth Circuit has long taken a broad view of the work that makes up an employee's principal activities. They include all of an employee's predominant job responsibilities and any tasks incidental to those responsibilities. *Dunlop v. City Elec., Inc.*, 527 F.2d 394, 399-401 (5th Cir. 1976) (*citing Mitchell v. Mitchell Truck Line, Inc.*, 286 F.2d 721 (5th Cir. 1961)); *see also Vega*, 36 F.3d at 424.

(W.D. Mich. Dec. 23, 2020) ("If two employees are needed to perform a flagging job, and employees are categorically forbidden from parking at the worksite, then the only way a flagging job could be performed is if the flagger with the company truck transported a partner. This would make such partner transportation integral and indispensable to the activity of flagging."); *Thacker v. Halter Vegetation Management, Inc.*, No. 2:13–cv–00378–JMS–WGH, 2015 WL 417713, *10 (Jan. 30, 2015) ("[t]o be sure, picking up and transporting coworkers is compensable if doing so extended [the] commute past the normal commute range, or if [the plaintiff] picked up coworkers and/or transported them to work sites after going to [the employer's] office, and returned them to [the employer's] office at the end of the day."); *Bleichner v. Spies Painting & Decorating, Inc.*, 2009 WL 281145 (W.D.Wis.2009) ("use of the company vehicle to transport other employees to and from the jobsites is properly considered 'work' under the FLSA.")

      c.  *It is undisputed that Plaintiffs routinely performed compensable work before traveling to the jobsite at the beginning of the workday and after traveling back from the jobsite at the end of the workday.*

Before driving to their jobsites or after driving back, the Plaintiffs routinely performed one or more compensable work tasks that constitute "principal activities," including: (1) filling or topping off an auxiliary "drag" (or "L") tank on their company provided pickup trucks that they used to fuel their cranes (Undisputed Fact 12.); (2) acquiring and loading other equipment and materials, such as Diesel Exhaust Fluid (DEF), grease, and cleaning products needed to maintain their cranes in working order (Undisputed Fact 13); and (3) picking up or dropping off riggers who worked with the crane operators on the jobsite and were required for many jobs. (Undisputed Fact 14.)[9]

On many days, the Plaintiffs obtained and loaded fuel and necessary work materials at TNT's

---

[9] These are only examples, not an exhaustive list, of some of the most common unpaid compensable tasks that Plaintiffs routinely performed. With this motion, Plaintiffs seek only a finding that Defendant is liable for unpaid overtime because it refused to pay for at least some compensable tasks in overtime weeks. The amount of damages—based on evidence of the full range of unpaid compensable tasks and the frequency with which each plaintiff performed them—is left to be determined at trial.

yard. (Undisputed Fact 15.) Even if TNT did not specifically instruct a Plaintiff to report to the yard on a particular day to pick up a rigger or particular materials or equipment, TNT expected them to stop at the yard on the way to or from their jobsites as often as needed to stock up on fuel and other materials needed to maintain their cranes in good working order. (Undisputed Fact 16.) On jobs that were too far from one of TNT's yards, Plaintiffs were required to stop at a service station or store to purchase and load the same necessary fuel and materials. (Undisputed Fact 17.) TNT issued the Plaintiffs company credit cards to purchase those items needed for the job. (Undisputed Fact 18.)

"The main role of the rigger is to connect whatever is being lifted to the crane hook" and TNT's customers require a rigger on many jobs. (Undisputed Fact 19.) Personal vehicles were not allowed on jobsites for "liability and reliability" reasons. (Undisputed Fact 20.) TNT often required crane operators to pick up and drop off riggers at TNT's yard and transport them to the jobsite because TNT did not provide riggers with company vehicles. (Undisputed Fact 21.) In most cases, stopping at TNT's yard to pick up or drop off a rigger extended the crane operators' commute. (Undisputed Fact 22.)

These activities were all indispensable to the performance of the Plaintiffs' work. After all, (1) without fuel, the Plaintiffs could not run the cranes; (2) without DEF, grease, and cleaning products, the Plaintiffs could not keep the cranes in good working order; and (3) without a rigger, the Plaintiffs could not safely perform their jobs. Therefore, it is undisputed that Plaintiffs performed compensable work before driving to or after driving from their jobsites most days. Consequently, under the continuous workday rule, Plaintiffs' driving time to or from the jobsites is compensable on those legs of the trip bounded on either or both ends by other compensable work.

        d. *TNT admits that, depending on certain circumstances and its arrangement with its customer, it routinely refused to pay Plaintiffs for compensable work before traveling to the jobsite at the beginning of the workday or after traveling back from the jobsite at the end the workday, as well as the compensable travel time.*

TNT issued and followed written and unwritten policies that it would not pay its crane operators for any travel time to and from their jobsites on certain jobs and under certain circumstances, depending

mainly on whether TNT's customer paid for the travel time. (*See* Undisputed Facts 23-30.) These policies applied without regard to whether the operators had performed compensable work that bounded the continuous workday before traveling to the jobsite or after traveling back. (*See id.*) These policies varied slightly from branch to branch and evolved over time. (*See id.*) Under each of the various iterations of its policies, with some exceptions under certain conditions, TNT did not pay crane operators for daily travel time to and from the jobsite in company pickup trucks if TNT's contract with its customer did not include payment for that travel time, and sometimes TNT did not pay the travel time even when the customer did. (*See id.*)[10]

For example, TNT's Midland and San Antonio branches followed written policies stating that travel time would not be paid unless (1) the customer paid for it or (2) the crane operator opted to (a) stay in a hotel and (b) receive a $35 per diem (or $60 if he stayed at a man camp during a certain period at TNT's Midland Branch). (Undisputed Facts 23, 26.) If the crane operator opted to stay in his own lodging, he would receive only a $100 per diem and would not be paid travel time, unless TNT's customer paid for the travel time, regardless of whether the operator performed compensable work before traveling to the jobsite or after returning. (*Id.*) However, at least in San Antonio, even if the customer paid for travel time, TNT still would not pay the crane operators for their travel time if they opted for the $100 per diem. (Undisputed Fact 24.) Some details of these written policies have been amended from time to time. (Undisputed Fact 25.)

Additionally, for "continuous" jobs (i.e., those that lasted longer than one day) in the greater San Antonio area that did not require an overnight stay, TNT's policy was that crane operators were not paid for daily travel time in company pickups. (Undisputed Fact 27.) Instead, they were only paid travel time when driving cranes or haul trucks, which typically occurred only on the first and last day of the job

---

[10] Across all branches, TNT was generally able to charge its customers for time crane operators spent traveling in a crane or haul truck, and TNT generally paid its crane operators for that time. TNT's policies of not paying for certain travel time that are the subject of this motion pertain to days in which crane operators traveled in company pickup trucks or personal vehicles.

when they mobilized and demobilized the equipment on the jobsite. (*Id.*) For such jobs, TNT instructed operators on their timesheets: "On continued jobs your time STARTS & STOPS at the job except the first and last day." (*Id.*) In spite of that policy, Todd Stevens, who has been in charge of reviewing crane operators' time sheets in the San Antonio Branch throughout the relevant period, claims that on San Antonio-area "continuous" jobs, if an operator had indicated on his time sheet that he performed compensable work, like stopping at a gas station to get necessary work supplies, he would be paid. (Undisputed Facts 7-10, 28.) However, Stevens admits he does not recall anyone ever explaining that to the operators nor any operators ever asking to be paid under those circumstances. (Undisputed Fact 28.)

Similarly, TNT's Houston Branch had an unwritten policy that crane operators were only paid travel time the first and last day of "continuous jobs" (i.e., jobs lasting more than one day) because its contracts with its customers on those jobs did not include daily travel time in pickups. (Undisputed Fact 29.) The same policies regarding travel time pay for the Houston Branch also applied to TNT's Freeport yard because it was a satellite yard to the Houston Branch under Murray's supervision. (Undisputed Fact 30.) This policy applied even though crane operators assigned to TNT's Houston and Freeport yards, like crane operators at TNT's other branches, routinely loaded fuel in their auxiliary tanks to fuel their cranes and loaded other materials needed for their work before traveling to their jobsites or after returning from their jobsites. (*See* Undisputed Facts 18, 31 (TNT provided Houston and Freeport crane operators with credit cards to purchase fuel and supplies needed for the job if it was inconvenient to pick them up from the Houston or Freeport yards.).)

First, TNT's managers instructed crane operators not to claim travel time when TNT's policies precluded it, and operators generally complied by not claiming it. (Undisputed Fact 32.) Second, on occasions when crane operators did claim travel time on their time sheets, and even when they documented particular compensable tasks before traveling to the jobsite or after returning, TNT managers cut that time from their time sheets and refused to pay it. (Undisputed Fact 33.) Perhaps because of these undisputed facts, somee TNT witnesses who claimed the Plaintiffs would have been

paid if they had recorded all compensable time ultimately recanted and admitted that they were not paid or would not be paid even if they had recorded all time. (Undisputed Facts 26, 33 (Harrison), Undisputed Fact 33 (Stevens).

The Plaintiffs worked well over forty hours, and often over 100 hours, most weeks. (Undisputed Fact 34.) Therefore most of that routinely unpaid compensable time occurred in overtime weeks and therefore constituted unpaid overtime hours. Indeed, TNT admitted to cutting compensable tasks and travel time in overtime weeks. (Undisputed Fact 26.)

> e. *TNT undisputedly knew, or had reason to believe, that Plaintiffs were working overtime off the clock.*

Under the FLSA,

> no employer shall employ any of his employees . . . for a workweek longer than forty hours unless such employee receives compensation for his employment in excess . . . [of forty] hours . . . at a rate not less than one and one-half times the regular rate at which he is employed."

29 U.S.C. § 207(a)(1); 29 C.F.R. § 778.100-.105. The FLSA defines "employ" very broadly as "to suffer or permit to work." 29 U.S.C. § 203(g). Consequently, "[a]n employer who is armed with [knowledge that an employee is working overtime] cannot stand idly by and allow an employee to perform overtime work without proper compensation, even if the employee does not make a claim for the overtime compensation." *Fairchild v. All Am. Check Cashing, Inc.*, 815 F.3d 959, 964 (5th Cir. 2016) (quoting *Harvill v. Westward Commc'ns, L.L.C.*, 433 F.3d 428, 441 (5th Cir. 2005). In other words, an employer who knows or has "reason to believe" that an employee is working overtime cannot look the other way, accepting the benefit of that work, without paying the employee in accordance with the FLSA. *Fairchild*, 815 F.3d at 965.

The Fifth Circuit recently reaffirmed that an employer cannot escape liability by claiming "it was unaware that employees were not recording overtime hours" when a "supervisor had actual knowledge or, at a minimum, constructive knowledge that the employees were working, but not reporting, overtime hours." *United States Dep't of Lab. v. Five Star Automatic Fire Prot., L.L.C.*, 987

F.3d 436, 444 (5th Cir.), *reh'g denied*, 997 F.3d 1258 (5th Cir. 2021) (citing *Brennan v. General Motors Acceptance Corporation*, 482 F.2d 825, 827-28 (5th Cir. 1973). "The company cannot disclaim knowledge when certain segments of its management squelched truthful responses." *Id.* (cleaned up); *see also* 29 C.F.R. § 785.13. ("[I]t is the duty of the management to exercise its control and see that the work is not performed if it does not want it to be performed . . . ."). Thus, the Fifth Circuit has repeatedly affirmed district court findings of overtime violations "based on the representative testimony of a de facto policy of underreporting time." *Id.*

Here, TNT admits not only to a *de facto* policy of underreporting time, but to a formal policy of nonpayment for compensable travel and other work tasks that it was aware Plaintiffs performed at the beginning and end of their shifts. TNT instructed and expected Plaintiffs not to record on their time sheets the travel and other work tasks that it refused to compensate. (Undisputed Fact 32.) Furthermore, TNT admits it cut Plaintiffs' time from their time sheets when they claimed travel time on their time sheets in contravention of TNT's policies, regardless of whether they performed compensable tasks. (Undisputed Fact 33.)

Therefore, because it knew (or should have known) that the Plaintiffs were working off the clock, TNT is legally foreclosed from attempting to disclaim knowledge of particular instances when Plaintiffs performed such tasks without recording them.

**B. Plaintiffs are entitled to utilize the *Mt. Clemens Pottery* burden-shifting framework for determining the amount of uncompensated travel time.**

Every employer subject to the FLSA is required to "make, keep, and preserve" records of its employees' hours worked. 29 U.S.C. § 211(c); 29 C.F.R. § 516.2. The recordkeeping requirement includes time sheets "on which are entered the daily starting and stopping time of individual employees." 29 C.F.R. § 516.6. "Seventy-five years ago in *Anderson v. Mt. Clemens Pottery Company*, the Supreme Court fashioned a burden-shifting framework for federal wage claims where an employer fails to maintain proper records." *Five Star*, 987 F.3d at 439 (citing *Mt. Clemens*, 328 U.S. 680, 687 (1946)).

"Under *Mt. Clemens*, if 'the employer's records are inaccurate or inadequate,' a plaintiff need only show by 'just and reasonable inference' that she was an employee, worked the hours, and wasn't paid." *Id.* at 439-40. (quoting *Mt. Clemens*). "It's a lenient standard rooted in the view that an employer shouldn't benefit from its failure to keep required payroll records, thereby making the best evidence of damages unavailable." *Id.* at 440.

Under the *Mt. Clemens Pottery* standard, a plaintiff does not have to "prove each hour of overtime work with unerring accuracy or certainty." *Pforr v. Food Lion, Inc.*, 851 F.2d 106, 108 (4th Cir. 1988). Rather, a Plaintiff is only required to show "the amount and extent of improperly compensated work as 'a matter of just and reasonable inference.' " *Mt. Clemens*, 328 U.S. at 687. "[W]hen assessing damages under the *Anderson* standard, a court may draw inferences from oral testimony, sworn declarations, and whatever relevant documentary evidence a plaintiff is able to provide." *Ventura v. Bebo Foods, Inc.*, 738 F. Supp. 2d 8, 13 (D.D.C. 2010). "Where the inaccuracy is due to the employer's failure to keep adequate records as required by statute, imprecise evidence on quantum provides a "sufficient basis" for damages. *Reeves v. International Tel. and Tel. Corp.*, 616 F.2d 1342, 1351 (5th Cir. 1980). Under these circumstances, [the Fifth Circuit has] "in effect ordered the fact finder to do the best he could in assessing damages." *Id*. In *Reeves*, the Fifth Circuit upheld the district court's award of unpaid wages based on the plaintiff's testimony of his estimate of average hours per week based on a "running total of hours" that he conceded "corresponded to the rough computations of his subconscious mind." Id. at 1352. The court held the award "reflected a conscientious adherence to the rule enunciated in *Anderson v. Mt. Clemens*." *Id.*

Once a plaintiff provides an estimate of unpaid hours and wages, "[t]he burden then shifts to the employer to come forward with evidence of the precise amount of work performed or with evidence to negative the reasonableness of the inference to be drawn from the employee's evidence." *Id.* at 687-88. If the employer fails to do so, it cannot complain that the resulting calculations of the number of hours worked or back pay owed is too uncertain or approximate. *Id.* at 680; *Marshall v. Partida*, 613 F.2d

1360, 1362 (5th Cir. 1980); *Hodgson v. Ricky Fashions*, 434 F.2d 1261, 1264 (5th Cir. 1970); *Mitchell v. Mitchell Truck Line*, 286 F. 2d 721, 725 (5th Cir. 1970).

To be clear, Plaintiffs do not seek a ruling that they have carried their burden under *Mt. Clemens Pottery* because they have not yet presented their estimates of damages and all supporting evidence to the Court. Damages must be determined at trial. Rather, Plaintiffs seek a ruling simply that the *Mt. Clemens Pottery* burden-shifting rule applies in this case because TNT failed to keep complete and accurate records of their hours.

In *Five Star*, the Fifth Circuit affirmed the district court's application of the *Mt. Clemens* burden-shifting rule based on "consistent testimony that Five Star urged employees not to record their pre- and post-shift work hours," 987 F.3d at 440, and the Court's finding that "while the typical workday ended at 3:30 pm, that was the time employees left the jobsite. And Five Star didn't compensate employees for the required travel time back to the shop." *Id.* at 441. Likewise, both TNT and Plaintiffs have offered consistent testimony that TNT told the Plaintiffs that, depending on its arrangement with its customers, TNT would not compensate Plaintiffs for compensable work tasks before and after traveling to the jobsite or the required travel time. (Sections III(A)(2)(d), above.) Both sides also testify consistently that TNT urged Plaintiffs not to record that time on their time sheets, and that the Plaintiffs routinely did not record the time. (Undisputed Fact 32.) Therefore, the Court must apply the *Mt. Clemens Pottery* burden-shifting rule at trial.

## C. TNT cannot establish its good faith defense to liquidated damages because its officers and managers knew it was violating the FLSA.

"Any employer who violates the [FLSA's overtime provision] shall be liable to the employee or employees affected in the amount of their . . . unpaid overtime compensation . . . and in an additional equal amount as liquidated damages." 29 U.S.C. § 216(b). "Liquidated damages" under the FLSA are compensatory in nature, not punitive. *See Brooklyn Sav. Bank v. O'Neil*, 324 U.S. 697, 707-08 (holding that the purpose of the FLSA's liquidated damages provision is to compensate underpaid workers "for

the retention of a workman's pay which might result in damages too obscure and difficult of proof for estimate other than by liquidated damages").

"A court *must* grant liquidated damages under Section 216 of the FLSA unless the employer meets its substantial burden of persuading the court that its act or omission was both in good faith and reasonable." *Mohammadi v. Nwabuisi*, 990 F. Supp. 2d 723, 749 (W.D. Tex. 2014), *aff'd in part, rev'd in part and remanded on other grounds*, 605 F. App'x 329 (5th Cir. 2015) (citing *Lowe v. Southmark Corp.,* 998 F.2d 335, 337–38 (5th Cir.1993); *Singer v. Waco*, 324 F.3d 813, 823 (5th Cir.2003); *Barcellona v. Tiffany English Pub, Inc.,* 597 F.2d 464, 468 (5th Cir.1979)). The good-faith affirmative defense requires defendants to carry the "substantial burden" of proving that they made an attempt to comply with the FLSA that was *both* in subjective good faith *and* objectively reasonable. *Mireles v. Frio Foods, Inc.*, 899 F.2d 1407, 1415 (5th Cir. 1990) (citing 29 U.S.C. § 260). To support the subjective component of this defense, the employer is required to provide "plain and substantial evidence of at least an honest intention to ascertain what the FLSA requires and to comply with it." *Carmack v. Park Cities Healthcare, LLC*, 321 F. Supp. 3d 689, 707 (N.D. Tex. 2018). "Even if the Court finds that an employer acted with subjective good faith, however, the employer must also demonstrate that it acted with objective good faith. *Campos v. Lone Star Wheel Components, Inc.*, Civil Action No. 3:13-CV-04088-N, 2016 U.S. Dist. LEXIS 195224, at *12 (N.D. Tex. 2016).

Under section 260, "good faith requires some duty to investigate potential liability under the FLSA." *Mohammadi*, 990 F. Supp. 2d at 749 (citing *Barcellona,* 597 F.2d at 469). "Lack of good faith is demonstrated when an employer "knows, or has reason to know, that his conduct is governed by the [FLSA]." *Reeves*, 616 F.2d at 1353 (5th Cir. 1980) (quoting *Brennan v. Heard*, 491 F.2d 1, 3 (5th Cir. 1974)); s*ee also Coleman v. Jiffy June Farms, Inc.,* 458 F.2d 1139, 1142 (5th Cir.1971) ("Stated most simply, we think the test should be: Did the employer know the FLSA was in the picture?").

TNT admits not only that it knew that its conduct is governed by the FLSA, but that it also knew the FLSA required it to pay its employees for the precise work tasks and travel time at issue in this

motion. TNT's designated corporate representative Antoy Bell, who is a licensed attorney and TNT's Human Resources Director, agrees that obtaining and loading fuel and materials needed for the job at its yards or at services stations is compensable work. (Undisputed Fact 35.) Consequently, Bell claims he advised TNT's Midland, San Antonio, and Houston Branch Managers that TNT was legally obligated to compensate crane operators for travel from TNT's branch yards to jobsites without exception. (Undisputed Fact 36.)

TNT Midland Branch Manager John Harrison testified that he understands the continuous workday rule and agrees that loading diesel in an auxiliary ("L") tank and other equipment onto a truck is work time. (Undisputed Fact 37.)

Likewise, in his role as TNT San Antonio Branch "time approver," Todd Stevens understood that crane operators are legally entitled to be paid for time they spend obtaining and loading fuel or supplies needed for work from TNT's yard or stores or gas stations before or after driving to their jobsites, as well as the drive time that falls between other compensable tasks. (Undisputed Facts 9, 38.) Stevens testified clearly that he understood the law requires TNT to pay crane operators for their travel time when it falls between other compensable work tasks, but TNT did not pay that time, following its written policy, when the operator provided his own lodging and received his $100 per diem. (Undisputed Fact 39.)

TNT Houston Branch Manager Alex "Bubba" Murray also testified that he has understood throughout his tenure at TNT that the FLSA applies to TNT, that the time crane operators spend loading fuel into auxiliary "drag" tanks or loading supplies needed for work are compensable tasks that can start and end the workday, and that travel within the continuous workday must be paid. (Undisputed Fact 40.)

Nevertheless, TNT admits that, as a matter of policy, it refused to pay the Plaintiffs for this compensable time, depending on the type of job and arrangement TNT had with its customer. (*See* Section III(A)(d) above.) Therefore, Plaintiffs seek summary judgment denying and dismissing TNT's good faith defense and holding that TNT is liable for liquidated damages. The issue is particularly

appropriate for disposition on summary judgment given the district court's discretion to award liquidated damages even if an employer establishes the good faith defense. *See Mireles*, 899 F.2d at 1415 n. 8 ("Even if a trial court is satisfied that an employer acted both in good faith and reasonably, it may still award liquidated damages at its discretion in any amount up to that allowed by 29 U.S.C. § 216(b)."); 29 U.S.C. § 260 (if the employer proves good faith and reasonable belief, "the court may, in its sound discretion, award no liquidated damages or award any amount thereof").[11]

## IV.   CONCLUSION

For the foregoing reasons, this Court should grant Plaintiffs' Motion for Partial Summary Judgment and find, as a matter of law, that:

1.    TNT is liable for unpaid overtime compensation for the unpaid time Plaintiffs spent performing the first and last principal activities of the day and travel time between the Plaintiffs' jobsites and other locations where they performed the first and last principal activities of the day;

2.    TNT's failure to accurately record all the Plaintiffs' travel and other work time entitles the Plaintiffs to the *Mt. Clemens Pottery* burden-shifting framework for determining the amount of compensable time for which TNT owes the Plaintiffs overtime compensation; and

3.    TNT cannot establish its good faith defense to liquidated damages because its officers and managers knew they were violating the law.

---

[11] Defendant's admissions that it refused to pay for travel and work tasks despite knowing the FLSA requires compensation not only foreclose Defendant's good faith defense but also establish that the violations were willful. However, Plaintiffs defer a ruling on their claim of willfulness until trial.

Respectfully submitted,

**FAIR LABOR LAW**


By:  */s/ Aaron Johnson*
Aaron Johnson
State Bar No. 24056961
ajohnson@fairlaborlaw.com
314 E. Highland Mall Blvd, Ste. 401
Austin, Texas 78752
Ph: (512) 277-3505
Ph: (512) 277-3254

**MORELAND VERRETT, P.C.**
Edmond S. Moreland, Jr.
State Bar No. 24002644
edmond@morelandlaw.com
Daniel A. Verrett
State Bar No. 24075220
daniel@morelandlaw.com
700 West Summit Drive
Wimberley, Texas 78676
Ph: (512) 782-0567
Fax: (512) 782-0605

**ATTORNEYS FOR PLAINTIFF**


## CERTIFICATE OF SERVICE

I hereby certify that on October 4, 2021, I electronically submitted the foregoing document for filing using the Court's CM/ECF system, which will serve a true and correct copy of the foregoing document upon counsel of record.


*/s/ Aaron Johnson*
Aaron Johnosn